**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| CHANDA TAYLOR, | |
| Plaintiff, | Civil Action No.: |
| v. | |
| CITY OF WALTHOURVILLE, GEORGIA, | |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW, Plaintiff Chanda Taylor and brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. Plaintiff alleges that Defendant City of Walthourville, Georgia subjected her to harassment based on sex, and then subjected her to retaliation after she engaged in protected activities, respectfully showing the Court as follows:

### JURISIDCTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, 28 U.S.C. § 1331, and 28 U.S.C. § 1343.

2.

Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391 and because Plaintiff was employed, and the events underlying this action, occurred in Liberty County, Georgia, which is located in this judicial district.

## PARTIES

3.

Plaintiff Chanda Taylor (hereinafter, "Plaintiff" or "Taylor") is a citizen of the United States and a resident of Georgia. At all relevant times, Ms. Taylor was considered a covered employee under Title VII of the Civil Rights Act.

4.

Defendant City of Walthourville, Georgia (hereinafter, "Defendant") is a municipality that may be served by delivering a copy of the Summons and Complaint to its Mayor, the Honorable Larry Baker, at City Hall located at 222 Busbee Road, Walthourville, Liberty County, Georgia 31333, pursuant to O.C.G.A. § 9-11-4(e)(5).

5.

Defendant employed in excess of fifteen employees for every week of the year 2020 and preceding years, and is otherwise a covered entity and employer within the meaning of Title VII of the Civil Rights Act.

6.

Defendant is a covered entity and employer within the meaning of Title VII of the Civil Rights Act.

## STATEMENT OF FACTS

7.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 6, as if the same were set forth herein.

8.

Ms. Taylor began her employment in 2017 as the Clerk of Defendant's Municipal Court.

9.

Ms. Taylor was qualified for her position, and at all relevant times, her performance was exemplary.

10.

As the Municipal Court Clerk, Ms. Taylor maintained an office inside of Defendant's Police Department, which is located next to the Walthourville City Hall.

11.

In January 2020, Mayor of Walthourville Larry Baker (hereinafter, "Mayor" or "Mayor Baker") was sworn into office and began his first term as Defendant's Mayor.

12.

Shortly after taking office, while Mayor Baker was visiting the Police Department, he once asked to speak with Ms. Taylor outside. During this conversation, Mayor Baker asked to ask Ms. Taylor if he could trust her. The Mayor then proceeded to tell Ms. Taylor that the rumors about he and his assistant having an affair were false, and then asked Ms. Taylor about her own relationship status.

13.

This initial conversation with Mayor Baker made Ms. Taylor feel very uncomfortable since it was not normal for Defendant's employees to ask about the specifics of Ms. Taylor's personal life, particularly her dating life or relationship status, or even for coworkers to offer information their own lives outside of work.

14.

Around February 2020, Mayor Baker began calling Ms. Taylor's personal mobile phone. These phone calls would come at different times of the day, including well after regular business hours.

15.

Ms. Taylor initially gave Mayor Baker her personal cell phone number upon the Mayor's request, but she assumed that was asking for it for reasons related to work because she did not have a mobile phone supplied by the employer.

16.

Other employees working in the Police Department and City Hall had Ms. Taylor's phone number for the purposes of contacting her for work-related reasons.

17.

However, Mayor Baker never called Ms. Taylor for any matters pertaining to City Hall, the Police Department, or any of Defendant's operations.

18.

During the first phone call that Ms. Taylor received in February 2020, Mayor Baker asked Ms. Taylor why she had not called to check the Mayor. Confused by the question, Ms. Taylor responded that she did not realize that she was supposed to be calling to check in on Mayor Baker.

19.

After the initial phone call, Mayor Baker would call Ms. Taylor once every several weeks until August 2020. Generally, each one of these phone calls would occur after Ms. Taylor had left work for the day and would involve Mayor Baker asking Ms. Taylor about her plans for the evening.

20.

Ms. Taylor was not comfortable sharing, and she did not provide, and information about her personal life to Mayor Baker, and she did not accept the Mayor invitation to meet outside of work.

21.

Around the time of these phone calls, Mayor Baker also began to visit the Police Department more often.

22.

When Mayor Baker first took office and came to the Police Department, he would come up to Ms. Taylor's desk and say that he was there to see the Police Chief. It was common for visitors to the building to first speak to Ms. Taylor before being assisted or other referred to the person they came to see.

23.

As such, Ms. Taylor did not initially think that anything was unusual when Mayor Baker stopped by her desk on the Mayor's way to see the Police Chief.

24.

However, as time progressed, Mayor Baker began to stop by the Police Department when there was no one else in the building other than Ms. Taylor.

25.

As a result, it became clear to Ms. Taylor that the Mayor was coming to the Police Department, not to visit with the Police Chief, but to see Ms. Taylor.

26.

The Mayor began stopping by at least three times per week. With each visit, Mayor Baker started sitting down at Ms. Taylor's desk, where he would stay and try to converse with her for fifteen to twenty minutes on each occasion.

27.

Ms. Taylor did not understand why Mayor Baker was dropping in almost every day, but she did not feel like she had the authority or ability to ask the City's chief executive to leave her office. Further, the conversations were mostly one-sided, with the Mayor taking up most of the conversation, particularly because Ms. Taylor was neither comfortable with the topic of conversation, nor about sharing private details about her own life.

28.

On one occasion when Mayor Baker was visiting the Police Department, he went into Ms. Taylor's office and then the Mayor used his index finger to poke Ms. Taylor on her the side.

29.

Ms. Taylor did not appreciate Mayor Baker's unwelcomed physical contact, and she specifically asked the Mayor to refrain from poking or touching her again.

30.

During one of their conversations, Mayor Baker told Ms. Taylor that he could "do what [he] want[ed]," as he was the Mayor and "made the rules."

31.

As a result of comments like these and his other conduct, Ms. Taylor became concerned about speaking out against Mayor's conduct towards her, because Ms. Taylor feared that she would be terminated if she complained.

32.

On the morning of Friday August 21, 2020, Ms. Taylor was out of the office due to a family emergency.

33.

Specifically, Ms. Taylor had called the Police Chief that morning to inform him that she would not be at work that day because her grandmother had fallen ill.

34.

Following her conversation with the Police Chief, Mayor Baker called Ms. Taylor. The Mayor told Ms. Taylor that he was calling to see if she was alright.  During this brief call, the Mayor asked if Ms. Taylor wanted him there to hug her. Ms. Taylor was not sure how to respond to this comment, so she thanked him for his condolences and quickly ended the conversation.

35.

Just over one hour later, while Ms. Taylor was at the hospital gathered with family following the passing of her grandmother, Mayor Baker called Ms. Taylor again.

36.

Ms. Taylor answered Mayor Baker's call, and that call lasted approximately ten minutes.

37.

During this call, Mayor Baker told Ms. Taylor that he had been "sweet on," Ms. Taylor since he had first taken office in January 2020. Ms. Taylor understood the Mayor's comment to meant that he had feelings for Ms. Taylor.

38.

The Mayor then asked Ms. Taylor to take and send a nude picture to him.  Mayor Baker also asked, when she took the photo, that she make sure that her face was not in the picture, presumably to conceal her identity if anyone else saw the photo.

39.

The Mayor also asked Ms. Taylor to send her lunch schedule to him, suggesting that the two of them could use that time to meet up.

40.

Lastly, Mayor Baker offered to begin stopping by the Police Department, suggesting that the two of them could meet in the bathroom since that was an area of the building that was not captured by the video surveillance camera.

41.

Ms. Taylor was disgusted by this conversation, and she ended the call, having no intention of complying with any of Mayor Baker's requests or suggestions.

42.

Less than ten minutes after the call ended, and while Ms. Taylor was still in the hospital with family grieving the loss of her grandmother, Mayor Baker sent Ms. Taylor a text message, reading, "I am missing u wish I could be there to hold you."  As evidenced by her lack of response, this text message was unwelcomed by Ms. Taylor, and she found it to be abusive and inappropriate.

43.

Even though Ms. Taylor did not send a reply, Mayor Baker tried to elicit a response from her by sending two additional text messages.  First, the Mayor texted  again several hours after Ms. Taylor's grandmother had passed, simply saying "Hello."  Two days later, on a Sunday

morning at around 10:00 am, he texted saying, "Gm," which was presumably intended as "good morning." Again, Ms. Taylor responded to neither message.

44.

After Ms. Taylor did not respond to the Sunday morning text, the Mayor called Ms. Taylor around 2:15 pm. Ms. Taylor's mother, who had become aware of what Ms. Taylor was experiencing at work, answered the call and told Mayor Baker that Ms. Taylor did wish to speak to him, and that the Mayor needed to cease these communications with her.

45.

The next day, Monday August 24, 2020, Ms. Taylor advised her direct supervisor, Chief of Police Jerry J. Blash (hereinafter, "Chief Blash"), about the Mayor's ongoing harassment of her.

46.

On that same day, Chief Blash sent an email the City Clerk and Defendant's HR Administrator, about Ms. Taylor's complaint. Following the receipt of the email, Ms. Moss asked Ms. Taylor to submit a written statement.

47.

Ms. Taylor complied, and she submitted her written complaint the next day.

48.

On September 1, 2020, City Attorney Luke Moses (hereinafter, "City Attorney") interviewed Ms. Taylor regarding her allegations against Mayor Baker.

49.

Ms. Taylor had not been given prior notice about the interview until a few minutes before, when the City Attorney said that he was on his way to the Police Department to see her.

50.

The interview between Ms. Taylor and the City Attorney only lasted for less than fifteen minutes.

51.

Ms. Taylor recorded the entire interview with the City Attorney on her phone.

52.

Throughout the interview, the City Attorney repeatedly asked Ms. Taylor what would make her feel comfortable at work, and he offered suggestions as to what he believed would appease the situation. For example, the City Attorney suggested that Defendant could arrange for the Mayor not to speak to Ms. Taylor anymore. Ms. Taylor responded saying that she understood that with her job, she would have to interact with the Mayor occasionally, and that she just wished for him to cease his harassment and act in a professional manner in the future.

53.

The City Attorney advised Ms. Taylor that he had a duty to investigate Ms. Taylor's allegation, but because the Mayor was an elected official, the City Attorney did not have the power to make the Mayor do anything. The only action that the City Attorney told Ms. Taylor he would only be able to suggest to the Mayor that he should avoid interacting with Ms. Taylor going forward.

54.

Towards the end of the interview, the City Attorney asked Ms. Taylor if the issue could be considered resolved, so long as Mayor Baker avoided inappropriate contact and refrained from discussing the allegations with Ms. Taylor specifically.

55.

At no point during this conversation did the City Attorney assure Ms. Taylor that her complaint would be kept confidential or that she would not be subjected to retaliation as a result.

56.

Throughout the interview, the City Attorney appeared to be more concerned about Defendant's legal liability, asking Ms. Taylor several times if she intended to pursue legal action. In the beginning, he asked whether Ms. Taylor had retained an attorney, and towards the end of the meeting, the City Attorney asked, "doesn't sound like you're interested in taking legal action, is that correct?"

57.

Moreover, throughout the entirely of the interview, the City Attorney propounded leading questions, instead of asking open-ended questions.  This made Ms. Taylor feel, not as though her complaint was being taken seriously; rather, she felt like she was being cross examined like a hostile witness at trial.

58.

At the end of the interview, the City Attorney said that he would draft a memorandum regarding his investigation.

59.

However, Ms. Taylor did not receive a copy of that memorandum, despite emailing the City Attorney several times to ascertain whether it had been completed.

60.

On December 17, 2020, Ms. Taylor, through counsel, sent a letter to the City Attorney, requesting he produce the findings of his investigation to Ms. Taylor.

61.

In the Memorandum dated September 22, 2020, which was authored by the City Attorney (hereinafter, "Memorandum"), it states that Ms. Taylor had been advised during the interview that Ms. Taylor would not be subjected to retaliation due to her grievance, but this is not something that had been discussed during the prior conversation.

62.

According to Defendant's Personnel Manual (hereinafter, "Personnel Manual"), "[w]hen conducting an investigation, care will be taken to protect confidentiality to the fullest extent possible, while still permitting a meaningful investigation to be conducted."

63.

Even though the Personnel Manual requires Defendant to maintain confidentiality, Defendant failed to prevent Ms. Taylor's complaint from being disclosed.

64.

Within one month of submitting her complaint, the media reached out to Chief Blash asking for his comment regarding the complaint. Chief Blash refrained from commenting, and he called Ms. Taylor to inform her that the press was aware of her complaint.

65.

Ms. Taylor did not contact the media; instead, her complaint was leaked to the press and members of the public by another one of Defendant's employees.

66.

When the articles were published, the media did refrain from referring to Ms. Taylor by name, but citizens of Walthourville still became aware that Ms. Taylor was the individual who had submitted the underlying grievance.

67.

For example, the person who cleans the Police Department told Ms. Taylor that her "name is out there" and that people were aware of the fact that she was the one who complained about the Mayor's inappropriate conduct.

68.

Not only were citizens of Walthourville approaching Ms. Taylor regarding her complaints, so were members of the Mayor's family.

69.

Around October 14, 2020, one of Mayor Baker's relatives called Ms. Taylor, and asked questions regarding her complaint.

70.

The Personnel Manual also states that "[f]ollowing any investigation in which a complaint or report of workplace harassment or retaliation is sustained; the City of Walthourville will take prompt and appropriate corrective action."

71.

No conclusive finding was ever issued as to the complaint. In the Memorandum, the City Attorney simply wrote that he could not "confirm or deny the veracity of Ms. Taylor's allegations."

72.

No finding could be made because Defendant failed to sufficiently investigate the complaint.  There was a short interview with Ms. Taylor, and then supposedly there was another short meeting with Mayor Baker.  Purportedly, Mayor Baker told the City Attorney that he would act professionally in the future. But despite Ms. Taylor's repeated follow-ups with the City Attorney, no further actions beyond those interviews were taken by Defendant.

73.

The Personnel Manual further elaborates that "*any* employee found to have engaged in workplace harassment (including sexual harassment) or retaliation as defined by the policy [would] be subject to corrective action and/or disciplinary actions, up to and including termination of employment." (emphasis added)

74.

Defendant failed to follow its applicable personnel policies.

75.

Defendant failed to take any corrective action against Mayor Baker for his conduct toward Ms. Taylor.

76.

Defendant failed to provide any disciplinary action against the Mayor.

77.

At one point, the City Attorney told Ms. Taylor that nothing could be done to the Mayor since he is an elected official.

78.

Not only did Defendant fail to properly investigate, Defendant failed to afford Ms. Taylor's grievance with the "prompt and appropriate action" required under the Personnel Manual.

79.

Ms. Taylor did not have any other recourse under Defendant's policies since, "[i]f an employee believes his or her complaint or report of harassment or retaliation is not being properly addressed, he or she should notify the Mayor." For obvious reasons, that option was not available to Ms. Taylor.

80.

In addition to having to deal with rumors circulating around the City of Walthourville – a municipality with a population of less than 5,000 people – Ms. Taylor endured a drastic change in her work environment.

81.

Staff at City Hall, particularly those who worked the most-closely with the Mayor, started to treat Ms. Taylor differently. These coworkers became distant and refused to engage with Ms. Taylor. Further, Ms. Taylor would frequently overhear coworkers gossiping about her.

82.

Ms. Taylor's duties required her to often go to City Hall to deliver documents, but the employees in that building would refrain from making eye contact and would go out of their way to avoid speaking to Ms. Taylor.

83.

Due to the hostile work environment that Ms. Taylor was experiencing, she began asking the police officers in her building to deliver any paperwork for her.

84.

The Mayor, the Mayor's assistant, and the City Clerk refused to speak or engage with Ms. Taylor.

85.

If Ms. Taylor was needed for something at City Hall, the aforementioned individuals would contact Chief Blash, instead of Ms. Taylor, to ask Chief Blash to direct Ms. Taylor to perform the task.

86.

On October 19, 2020, Mayor Baker called a mandatory meeting with all employees of the Police Department.

87.

The Municipal Court is not only located within, but falls, under the Police Department.  As a result, Ms. Taylor generally attended meetings of the entire Police Department, and she was told to attend the October 19, 2020 meeting by her supervisors.

88.

Once Ms. Taylor arrived, and Mayor Baker saw her, the Mayor said in front of the while group, "Municipal Court Clerk, you can leave." Ms. Taylor was so taken aback by this comment that she remained frozen, both because of the fact that she normally attended these meetings and because of the Mayor's dismissive tone. When she did not leave immediately, Mayor Baker once again snapped, "Municipal Court Clerk, you can leave."

89.

Even though the Mayor claimed that the meeting was only for law enforcement officers, he did not dismiss several others in meeting who were neither officers, nor were employees of Defendant's Police Department.

90.

Ms. Taylor complied with the Mayor's order dismissing her, and she left the room embarrassed.  She immediately ran into the City Attorney, who asked Ms. Taylor what happened, but failed to follow up or take any actions.

91.

Due to the way she had been dismissed, Ms. Taylor did not attempt to attend any other meetings of the Police Department in which she believed the Mayor would be present.

92.

However, the Mayor and his staff continued to prevent Ms. Taylor from taking part in functions that she had previously been intimately involved.  For example, despite helping to plan and setting up an event with citizens and the Police Department, the Mayor did not let Ms. Taylor attend the event.

93.

In addition to the Mayor and other employees making it difficult for Ms. Taylor to perform her job, Ms. Taylor also felt like others close to the Mayor were engaged in conduct that was intended to intimate Ms. Taylor, including following Ms. Taylor's vehicle on the county's rural roads and loitering around the Police Department building and making it feel like Ms. Taylor was being watched by others.

94.

Due to the stress of the hostile work environment and the fear of running into Mayor Baker, Ms. Taylor found that it was distressing for her to merely go to work – a job that Ms. Taylor had previously enjoyed.

95.

By January 13, 2021, as a result of both the Mayor's harassment and the subsequent retaliation and intimidation, Ms. Taylor felt like she had no other choice but to resign

96.

After she resigned from the Police Department, Ms. Taylor accepted a position with the Liberty County Sheriff's Office. However, being that she, as an employee of the County, still had to interact with her former City coworkers, and since Ms. Taylor continued to be subjected to rumors and gossip, she was only able to stay in this position for about six months.

97.

The only way that Ms. Taylor felt like she could get away from the retaliatory intimidation and the rumors and gossip was to secure a position outside of the local government, which she was indeed able to do soon thereafter.

Procedural/Administrative Background

98.

On or about October 22, 2020, Ms. Taylor submitted her Charge of Discrimination to the Equal Employment Opportunity Commission (hereinafter, "EEOC"), alleging that she had been subjected to discrimination and harassment based on her sex, as well as retaliation, all in violation of Title VII of the Civil Rights Act.  The EEOC assigned Ms. Taylor's Charge Number 415-2020-01469.

99.

Defendant had notice of Ms. Taylor's Charge of Discrimination, participated in the proceedings before the EEOC, and was represented by counsel during said proceedings.

100.

Ms. Taylor requested that the EEOC issue a Right to Sue Letter, which it did on June 15, 2021.  Ms. Taylor, through counsel, received said Notice of Right to Sue on the same day.

101.

Ms. Taylor has exhausted her administrative remedies, and she is filing the instant action within ninety days of the EEOC's issuance and her receipt of the Notice of Right to Sue.

## COUNT I
## HARASSMENT BASED ON SEX
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

102.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 101, as if the same were set forth herein.

103.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against or harass any of its employees on the basis of sex. 42 U.S.C. § 2000e-2(a).

104.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively. *See* 42 U.S.C. §§ 2000e & 2000e-1.

105.

As alleged herein, Defendant, through the conduct of its employee, Mayor Baker, subjected Plaintiff to harassment in the form of unwelcome verbal and physical conduct involving and because of her sex.

106.

As alleged herein, the harassment affected a term or condition of Plaintiff's employment and had the purpose and effect of unreasonably interfering with the work environment and created an intimidating, hostile, and offensive work environment.

107.

Not only did the conduct alleged change Plaintiff's work environment, Plaintiff feared that if she were to oppose the conduct or report it to Defendant, she would be in jeopardy of losing her position.

108.

As alleged herein, Plaintiff's supervisor was responsible for the harassment, and Defendant was otherwise on notice of this conduct and took no meaningful corrective action.

109.

The harassment experienced by Plaintiff was severe, pervasive, abusive, hostile, and unwelcome by Plaintiff and occurred because of her sex.

110.

Defendant's conduct as alleged herein constitutes harassment and hostile work environment based on sex in violation of Title VII.

111.

Plaintiff has been injured by Defendant's harassment of her based on her sex, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, to the extent available, compensatory and punitive damages at the limit provided by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT II
## RETALIATION
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

### 112.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 101, as if the same were set forth herein.

### 113.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against or harass any of its employees because an employee has opposed any practice made unlawful by Title VII.  42 U.S.C. § 2000e-3(a).

### 114.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively, *See* 42 U.S.C. §§ 2000e & 2000e-1.

### 115.

During her employment with Defendant, Plaintiff's supervisor subjected Plaintiff to sexually-based conduct that was both severe and pervasive enough to change the working conductions and it was clearly unwelcomed by Plaintiff.

### 116.

Plaintiff had a reasonable, good faith belief that her supervisor's conduct constituted harassment in violation of the law.

### 117.

Indeed, Plaintiff's supervisor's conduct toward her was actionable sexual harassment, as alleged herein.

118.

Plaintiff opposed her supervisor's conduct by opposing the behavior and requesting and that the supervisor cease the conduct at issue.

119.

Plaintiff further opposed her supervisor's conduct by reporting the conduct to several individuals in management.

120.

An employee who complains about the type of harassment alleged is opposing a practice made unlawful by Title VII of the Civil Rights Act and is, therefore, engaged in a "protected activity."

121.

After Plaintiff opposed the harassment, she was subjected to materially adverse actions from the same supervisor and others associated with him, such as being subjected to additional harassment, having her duties modified and being excluded from meetings, as well as being threatened by the supervisor.

122.

An employee who complains about the type of harassment alleged is opposing a practice made unlawful by Title VII of the Civil Rights Act and is, therefore, engaged in a "protected activity."

123.

By October 22, 2020, Plaintiff had been subjected to the underlying harassment, retaliation for complaining about the conduct, including being excluded from work-related meetings, had her confidential grievance leaked to the media, and since Defendant had entirely failed to

communicate what, if anything, it had done in response to Plaintiff's complaint, Plaintiff filed a Charge of Discrimination with the EEOC.

124.

According to Title VII, the filing of a charge, is an activity expressly considered a statutorily protected activity.

125.

As alleged herein, the aforementioned adverse actions of which Plaintiff was subjected only began after Plaintiff opposed and reported her supervisor's harassment.  For this reason, amongst others, these adverse actions only occurred because of Plaintiff's participation in protected activities.

126.

Defendant's conduct, as alleged, herein constitutes retaliation in violation of Title VII of the Civil Rights Act.

127.

Plaintiff has been injured by Defendant's retaliation of her, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, to the extent available, compensatory and punitive damages at the limit provided by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT III
## CONSTRUCTIVE DISCHARGE
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

### 128.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 101, as if the same were set forth herein.

### 129.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discharge any employee on the basis of sex.  42 U.S.C. § 2000e-2(a).

### 130.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively.  *See* 42 U.S.C. §§ 2000e & 2000e-1.

### 131.

A claim for constructive discharge "is appropriate when an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign."  *Hicks v. City of Tuscaloosa, Ala.*, 870 F.3d 1253, 1258 (11th Cir. 2017).

### 132.

For the reasons set forth in Count I, supra, which are incorporated herein, Defendant subjected Plaintiff to harassment and hostile work environment based on her sex.

### 133.

Any reasonable person in Plaintiff's position would feel that her working conditions were so intolerable that she would feel compelled to resign.

134.

As a result of the harassment and hostile work environment described herein, Defendant made Plaintiff's working conditions so intolerable that Plaintiff felt compelled to submit her resignation on or about January 13, 2021.

135.

Defendant's conduct as alleged herein constitutes constructive discharge based on sex in violation of Title VII.

136.

Plaintiff will prove that Defendant's stated reasons for its conduct were not the true reasons, but, instead, were pretext to hide Defendant's discriminatory animus.

137.

Plaintiff has been injured by Defendant's constructive discharge, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, to the extent available, compensatory and punitive damages at the limit provided by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Chanda Taylor respectfully prays for the following relief:

1)      That Summons and Process be issued to Defendant City of Walthourville, Georgia, and that said Defendant be served as provided by law;

2)      That this matter be tried before a jury;

3)      That judgment be awarded for and in favor of Plaintiff and against Defendant City of Walthourville, Georgia on Count I for harassment based on sex in violation of Title VII of the Civil Rights Act, and grant Plaintiff all relief allowable under said law;

4)      That judgment be awarded for and in favor of Plaintiff and against Defendant City of Walthourville, Georgia on Count II for retaliation for engaging in protected activities in violation of Title VII of the Civil Rights Act, and grant Plaintiff all relief allowable under said law;

5)      That judgment be awarded for and in favor of Plaintiff and against Defendant City of Walthourville, Georgia on Count III for constructive discharge based on sex in violation of Title VII of the Civil Rights Act, and grant Plaintiff all relief allowable under said law;

6)      For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 13th day of September, 2021.

KENNETH E. BARTON III
Georgia Bar No. 301171
*Attorney for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
Telephone: (478) 841-9007
Facsimile: (478) 841-9002
keb@cooperbarton.com